IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

THE UNITED STATES OF AMERICA,     :          JURY TRIAL DEMANDED
                                  :
                Plaintiff,        :
                                  :          Civil Action
        v.                        :          No. _____
                                  :
LIBERTY AIR PARTS, INC., US SUPPLY :
CORPORATION, GEORGE ONORATO,      :
and ELLEN ONORATO,                :
                                  :
                Defendants.       :
_____:

## COMPLAINT

This procurement fraud case is about product substitution. Defendant Liberty Air Parts, Inc., a supplier of spare parts to the defense industry, agreed to supply bolts, rings, knobs, and rivets to the Defense Logistics Agency Troop Support-Philadelphia ("DLA"). Liberty Air Parts agreed to supply these things in non-surplus condition, meaning brand new—direct from the manufacturer or authorized dealer—and not left over from other government projects. Instead of supplying them in non-surplus condition, the company substituted leftover, surplus parts without telling anyone. Doing so caused DLA to overpay for surplus parts and undermined the fairness of the agency's competitive bidding process. Liberty Air Parts concealed the scheme by using a fake name, falsifying records, and hiding behind a sham corporation. The United States therefore brings this action under the False Claims Act, 31 U.S.C. §§ 3723-3733, seeking treble damages and penalties against both of these companies and the individuals who operated them.

### PARTIES

1.      Plaintiff is the United States of America.

2.      Defendants Liberty Airs Parts, Inc., and US Supply Corporation (collectively,

"the Companies") are corporations that shared a principal place of business at 58 Stratford Avenue in Greenlawn, New York.

3. Defendants George Onorato and Ellen Onorato are a married couple who resided at 58 Stratford Avenue in Greenlawn, New York—the same address used by the Companies. The couple currently reside at 55 Seaview Way in Lamoine, Maine.

4. Between 2012 and 2017, the Companies supplied spare parts to the military through purchase orders with DLA.

5. Ellen Onorato served as owner and president of the Companies and generally packed and shipped items.

6. George Onorato held no official title at the Companies, but researched solicitations, submitted quotes for supplies, and invoiced DLA.

7. Nobody worked for the Companies besides George Onorato and Ellen Onorato. The Companies had no employees.

8. Money flowed freely between Liberty Air Parts, US Supply Corporation, George Onorato, and Ellen Onorato.

9. Whenever Liberty Air Parts received money from DLA, the company transferred it to US Supply Corporation. George Onorato and Ellen Onorato then spent the money to fund Companies' joint operations or to cover their personal expenses, such as groceries and their mortgage.

**JURISDICTION AND VENUE**

10. This Court possesses subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1345.

11. Venue is proper under 28 U.S.C. §§ 1391(b) and 1391(c), and under 31 U.S.C. § 3732(a).

## DLA PROCURES SUPPLIES AND ADMINISTERS CONTRACTS
## TO SUPPORT THE DEPARTMENT OF DEFENSE

12. DLA is the largest logistics combat component that awards and administers contracts on behalf of various departments within the Department of Defense, including the United States Army, the United States Navy, and others.

13. When one of these Department of Defense departments needs supplies that cost less than a certain threshold, DLA issues a Request for Quotations and publishes the request online through the DLA Internet Bid Board System ("DIBBS").

14. DIBBS is a web-based application that provides the capability to search for, view, and submit secure quotes on Requests for Quotations for DLA items of supply.

## LIBERTY AIR PARTS AGREED TO SUPPLY A BOLT
## IN NON-SURPLUS CONDITION

15. On October 22, 2015, DLA issued Request for Quotations No. SPE5E4-16-T-0949 through DIBBS inviting prospective bidders to submit quotes to furnish a Bolt, Special ("the Bolt"), a critical application item manufactured by Meggitt (North Hollywood), Inc.

16. Critical application items are parts whose failure could jeopardize the lives of military personnel and the success of military operations.

17. DIBBS asked all bidders to state whether they proposed to supply the Bolt in surplus condition.

18. Surplus refers to new, unused material that the United States Government purchased and accepted, and thereafter sold through a government surplus program. *See* DLA Directive 52.211-9000 (defining government surplus material).

19.     When bidders propose to supply items in surplus condition, DIBBS prompts them to fill out a form required by federal regulations. *See* DLA Directive 52.211-9000(b)-(c) (Nov. 2011). Bidders provide supporting documentation on the form to demonstrate that the government previously owned the surplus items and to show that the items meet solicitation requirements.

20.     This documentation is important. DLA tracks the source of its supplies and evaluates their compliance with solicitation requirements, because any deviation from the solicitation or product defect can jeopardize the health and safety of military personnel who rely upon them—even more so for critical application items.

21.     Federal regulations therefore require contractors to retain evidence to document that items conform to solicitation requirements, including "information tracing the items back to the manufacturing source or its authorized distributor." DLA Directive 52.211-9014(b)(1) (Aug. 2012). "At a minimum, evidence shall be sufficient to establish the identity of the item, its manufacturing source, and conformance to the item description." *Id.*

22.     Moreover, DLA inspects items in surplus condition to ensure that they comply with solicitation requirements, and incurs evaluation costs when doing so.

23.     To reflect these evaluation costs, DLA adds an amount to the cost of items in surplus condition when it reviews proposals to determine the best and lowest price. *See* DLA Directive 52.211-9003(b) (requiring an additional fee for internal evaluation of surplus items). Thus, in their price quotes, contractors must identify whether they propose to supply items in surplus or non-surplus condition.

24.     Contractors who propose to supply items in surplus condition are less competitive during the bidding process, all else being equal, because DLA factors the evaluation costs into

the proposed price when evaluating quotes.

25.     Liberty Air Parts proposed to supply the Bolt for $1,200 in non-surplus condition.

26.     As shown on its quote below, the company answered "No" when DIBBS asked if the item was surplus:

---

· Material Requirements:
    Used, Reconditioned, Remanufactured, or New/Unused Government Surplus? **No**

---

27.     George Onorato submitted this quote on behalf of Liberty Air Parts, but, without DLA knowing it, he did not use his real name or address.

28.     Instead, George Onorato signed and submitted the quote as "John Marino," a fake name that he used only when working for Liberty Air Parts.

29.     George Onorato used his father's residential address on the quote—69-04 Ditmars Boulevard in Flushing, New York—as the business address for Liberty Air Parts rather than the company's actual address in Greenlawn, New York.

30.     Because Liberty Air Parts proposed to supply the Bolt in non-surplus condition, DIBBS did not require the company to complete the form or provide the documentation necessary for surplus items.

31.     DLA therefore did not add evaluation costs when it reviewed the company's price quote.

32.     Three other companies proposed to supply the Bolt at a lower price than Liberty Air Parts, but they proposed to supply it in surplus condition.

33.     DLA determined that these companies no longer offered the lowest price once the agency added the evaluation cost to the price to account for the surplus condition.

34.     On December 15, 2015, DLA accepted the quote from Liberty Air Parts by entering into Purchase Order No. SPE5E4-16-V-2261.

5

## AN UNSUCCESSFUL BIDDER ALLEGED THAT LIBERTY AIR PARTS MISREPRESENTED THE BOLT'S CONDITION

35.     The next day, on December 16, 2015, DLA's contracting officer received an email from an unsuccessful bidder—one of the other companies that had submitted a quote.

36.     The unsuccessful bidder protested the award, writing that Liberty Air Parts could not supply a non-surplus Bolt, as it had agreed to do, because it could not possibly obtain one from the original manufacturer in only thirty days.

37.     The unsuccessful bidder concluded that the Bolt had to be surplus, and Liberty Air Parts misidentified it as non-surplus.

## DLA INVESTIGATED THE ALLEGATION AND DEMANDED DOCUMENTS

38.     DLA promptly began to investigate the unsuccessful bidder's allegations.

39.     On December 18, 2015, while the investigation was underway, Liberty Air Parts shipped the Bolt to DLA and automatically triggered a request for the $1,200 payment.

40.     On December 19, 2015, DLA directed Liberty Air Parts to stop working on the purchase order and confirm that the company's quote was correct.

41.     DLA also asked Liberty Air Parts to provide supporting documentation to show its compliance with the purchase order, including documents showing that the Bolt came from the approved source listed in the purchase order.

42.     Liberty Air Parts ignored DLA's request.

43.     On December 21, 2015, the Bolt arrived at a DLA facility.

44.     On December 30, 2015, DLA followed up and again requested the supporting documentation.

45.     George Onorato, still using the name John Marino, eventually responded to DLA:

> I am sorry for the slow response, my qc is on vacation until 1/4/2015. when he gets back I will have him pull the proper certs for these parts

46.     DLA again demanded the supporting documents, so on January 8, 2016, Liberty Air Parts responded by providing an invoice showing where the company had obtained the Bolt.

47.     The invoice showed only that Liberty Air Parts had purchased the Bolt from US Supply Corporation. It failed to show that US Supply Corporation acquired the Bolt from the original manufacturer or authorized dealer, as required by the purchase order.

48.     On January 12, 2016, DLA told Liberty Air Parts that the documentation was not acceptable.

49.     In response, George Onorato (again using the name John Marino) wrote in the email below that Liberty Air Parts was still waiting to receive documentation from US Supply Corporation:

> I have been trying to get the proper documentation from us supply corp showing that they are a authorized dealer/distributor for Meggit inc., I have not received as yet.

50.     DLA had heard enough. On March 26, 2016, DLA cancelled the award to Liberty Air Parts.

51.     DLA then referred the matter to its Office of Inspector General, which referred it to the Department of Defense Office of Inspector General, Defense Criminal Investigative Service for a fraud investigation.

### LIBERTY AIR PARTS AND GEORGE ONORATO MADE FALSE STATEMENTS ABOUT THE BOLT AND CREATED FALSE RECORDS

52.     Liberty Air Parts and George Onorato made false statements and created false records in their efforts to conceal the Bolt's surplus condition, keep the contract alive, and obtain payment.

53.     For starters, Liberty Air Parts and George Onorato submitted a quote that falsely described the Bolt as in non-surplus condition when, in fact, it was in surplus condition.

54.     The original manufacturer possesses no record of selling the Bolt to either Liberty Air Parts or US Supply Corporation. *See* Decl. of Michelle Armstrong ¶ 7 (Mar. 27, 2019) ("Armstrong Decl."), attached as Exhibit 1.

55.     Neither one of the Companies was an authorized dealer of the Bolt. *See* Armstrong Decl. ¶¶ 9-10.

56.     Liberty Air Parts instead obtained the Bolt from KWAT Enterprises Corporation, a supplier in Norfolk, Virginia, that only furnishes items in surplus condition.

57.     Consistent with its usual practice, KWAT Enterprises supplied the Bolt to US Supply Corporation in surplus condition.

58.     Substituting this surplus Bolt was no innocent mistake by Liberty Air Parts. Surplus is a commonly understood term in the defense contracting industry, and Liberty Air Parts knew what it meant.

59.     So did George Onorato: a few months before he submitted the quote for the Bolt, he sent a July 2015 email that distinguished new surplus items from factory new items, showing that he knew the difference.

60.     Similarly, more than a year before proposing to supply the Bolt, Liberty Air Parts and George Onorato submitted a quote to DLA proposing to supply springs in surplus condition. Liberty Air Parts and George Onorato checked the appropriate box on DIBBS to indicate that the springs were in surplus condition, completed the form for surplus items, and provided the necessary documentation for surplus items.

61.     Liberty Air Parts and George Onorato then tried to conceal the source of the Bolt from DLA. When DLA investigated and sought information, Liberty Air Parts and George Onorato falsely stated that the company's "qc"—which refers to quality control—was on vacation.

62.     The "qc" was not on vacation, because no such person existed. Liberty Air Parts had no quality control and no employees. George Onorato and his wife were the only individuals who worked there.

63.     When DLA persisted, Liberty Air Parts and George Onorato falsely stated that they were waiting to receive "proper documentation" from US Supply Corporation.

64.     That statement was likewise false, because they were not waiting for US Supply Corporation to do anything. Liberty Air Parts and US Supply Corporation were interchangeable.

65.     Further, the statement was false because Liberty Air Parts and George Onorato knew that proper documentation did not exist.

66.     Liberty Air Parts and George Onorato next tried to create the false impression that Liberty Air Parts and US Supply Corporation were different companies. When DLA asked for supporting documentation, Liberty Air Parts provided the invoice below listing different addresses for the Companies:



67.     Contrary to the invoice, the Companies did not exist at these different locations. George Onorato and his wife operated both Companies from their basement in Greenlawn, New York.

68.     Liberty Air Parts and George Onorato used the name John Marino to perpetuate this false impression. The company's quotes, communications with DLA, and annual certifications to the agency used the John Marino alias in an effort to avoid detection and give the illusion that Liberty Air Parts and US Supply Corporation were separate, independent Companies.

69.     During the ensuing investigation, George Onorato declined to answer questions about the scheme by invoking his right against self-incrimination under the Fifth Amendment of the United States Constitution.

70.     For example, during oral testimony pursuant to 31 U.S.C. § 3733(h), George Onorato declined to answer whether he or the Companies made false statements to DLA:

```
"Q.  Have you ever made any false statements to the Defense
     Logistics Agency?"

A.   Based on my attorney's counsel, we're going to invoke
     the Fifth Amendment.

Q.   Did Liberty Air Parts make [an]y false statements to the
     Defense Logistics Agency?

A.   Based on my attorney's counsel, we will invoke the
     Fifth Amendment.

Q.   Did U.S. Supply Corporation make any false statements
     to the Defense Logistics Agency?

A.   I'll take the Fifth Amendment.
```

71.    George Onorato likewise declined to say whether he or the Companies misrepresented items as non-surplus that were in surplus condition:

```
Q.   Did you misrepresent items that you supplied to the
     Defense Logistics Agency as nonsurplus when they were
     actually surplus items?

A.   I'm going to invoke the Fifth Amendment.

Q.   Did Liberty Air Parts misrepresent items that it
     supplied to the Defense Logistics Agency as nonsurplus
     when they were actually surplus?

A.   I'm invoking the Fifth Amendment.

Q.   Did U.S. Supply Corporation misrepresent items that it
     supplied to the Defense Logistics Agency as nonsurplus
     when they were actually surplus?

A.   I'm going to invoke the Fifth Amendment.
```

72.    In addition, George Onorato declined to say whether he understood the difference between surplus condition and non-surplus condition when he created Liberty Air Parts:

```
Q.   Did you understand the difference between surplus items
     and nonsurplus items when you created Liberty Air
     Parts?

A.   I invoke the Fifth Amendment.
```

73.    Finally, George Onorato declined to say whether he concealed his identity from DLA in order to hide the fact that he operated both Liberty Air Parts and US Supply Corporation:

```
Q.   Did you conceal your identity from the Defense

     Logistics Agency in order to hide the fact that you

     were operating both Liberty Air Parts and U.S. Supply

     Corporation?

A.   I'm going to invoke the Fifth Amendment.
```

74.   George Onorato's silence speaks volumes. Unlike in criminal cases, "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter Palmigiano*, 425 U.S. 308, 318 (1976).

## LIBERTY AIR PARTS SUBMITTED A FALSE CLAIM FOR RINGS IN NON-SURPLUS CONDITION

75.   The unlawful substitution of items in surplus condition was not limited to the Bolt.

76.   On July 17, 2015, DLA issued Request for Quotations No. SPE5E4-15-T-C529 through DIBBS inviting prospective bidders to submit quotes to furnish 113 retaining rings ("the Rings"), a critical application item manufactured by Parker Hannifin Corporation.

77.   Liberty Air Parts submitted a quote and proposed to furnish the Rings for $10,220.85 in non-surplus condition.

78.   On December 18, 2015, DLA accepted the quote from Liberty Air Parts by entering into Purchase Order No. SPE5E4-16-M-0329.

79.   On January 10, 2016, an unsuccessful bidder notified DLA that the original source of the Rings could not supply them in only thirty days, as the purchase order required, and therefore Liberty Air Parts must be furnishing the Rings in surplus condition instead.

80.     To bolster the allegation, the unsuccessful bidder notified DLA that an online inventory system for Brown Helicopter, a third-party supplier, showed 171 surplus Rings in its inventory before DLA's purchase order with Liberty Air Parts.

81.     After DLA's purchase order, the inventory showed 113 fewer Rings remaining in inventory.

82.     The difference of 113 Rings was the same number that DLA ordered from Liberty Air Parts—either a remarkable coincidence, or a misrepresentation by Liberty Air Parts about the Rings' condition.

83.     The unsuccessful bidder lamented in an email to DLA, "It is suppliers such as this that make competition very difficult."

84.      DLA promptly investigated the bidder's allegation.

85.     While the investigation was underway, Liberty Air Parts shipped the Rings to DLA and requested the $10,220.85 payment.

86.     DLA ultimately determined that the unsuccessful bidder was right: Liberty Air Parts had obtained the Rings from Brown Helicopter in surplus condition and furnished them to DLA, contrary to the purchase order.

### LIBERTY AIR PARTS SUBMITTED A FALSE CLAIM FOR KNOBS IN NON-SURPLUS CONDITION

87.     On October 30, 2015, DLA issued Request for Quotations No. SPE5E8-16-T-1356 through DIBBS inviting prospective bidders to submit quotes to furnish knobs ("the Knobs"), a critical application item manufactured by Honeywell International, Inc.

88.     Liberty Air Parts submitted a quote and proposed to furnish eight Knobs for $11,340 in non-surplus condition.

89.     On December 30, 2015, DLA accepted the quote from Liberty Air Parts by entering into Purchase Order No. SPE5E8-16-M-1312.

90.     Liberty Air Parts thereafter shipped the Knobs to DLA, triggering an automatic request for the $11,340 payment.

91.     Based on the recent protests from unsuccessful bidders, DLA questioned the source of the Knobs and their compliance with the purchase order.

92.     Accordingly, on April 15, 2016, DLA asked Liberty Air Parts to provide documentation showing that the Knobs complied with the solicitation and purchase order requirements.

93.     George Onorato dismissed the request as a "homework assignment" from DLA's contracting officer. As he put it, "It says contracting officer [on the request], but whatever."

94.     Liberty Air Parts failed to provide the information, because it possessed no documentation showing that the Knobs were from the original manufacturer or authorized dealer in non-surplus condition.

95.     Liberty Air Parts had acquired the Knobs from a third-party supplier in surplus condition.

96.     During the ensuing investigation, the third-party supplier confirmed that it furnished these Knobs to US Supply Corporation in surplus condition.

**LIBERTY AIR PARTS SUBMITTED A FALSE CLAIM FOR RIVETS IN NON-SURPLUS CONDITION**

97.     On January 15, 2016, DLA issued Request for Quotations No. SPE5E9-16-T-3805 through DIBBS inviting prospective bidders to submit quotes to furnish rivets ("the Rivets"), a critical application item manufactured by Alcoa Global Fasteners, Inc.

14

98.     Liberty Air Parts submitted a quote and proposed to supply 200 Rivets for $800 in non-surplus condition.

99.     On January 19, 2016, DLA accepted the quote from Liberty Air Parts by entering into Purchase Order No. SPE5E9-16-V-1732.

100.    Liberty Air Parts thereafter shipped the Rivets to DLA, triggering an automatic request for the $800 payment.

101.    On February 5, 2016, DLA asked Liberty Air Parts to provide documentation showing that the Rivets complied with the solicitation and purchase order's requirements. DLA asked specifically for invoices and packing slips showing where it had obtained the Rivets.

102.    Liberty Air Parts and George Onorato knew that they supplied surplus Rivets contrary to the purchase order. They also knew that they obtained 5 Rivets from Peerless Aerospace Fastener Corporation, and obtained the remaining 195 Rivets from somewhere else in surplus condition.

103.    Liberty Air Parts and George Onorato therefore created a false invoice from Peerless Aerospace Fastener Corporation to make it appear as though they had obtained all 200 Rivets from the company.

104.    The packing slip attached as Exhibit 2 is the original one from Peerless Aerospace Fastener Corporation for sale No. SNYCMWJW, invoice No. INY2QWYF.

105.    In contrast, the packing slip attached as Exhibit 3 is the version of the same packing slip that Liberty Air Parts submitted to DLA in response to the agency's request for supporting documentation.

106.    Liberty Air Parts and George Onorato used a photocopier or computer scanner to alter the quantity of Rivets they received from Peerless Aerospace from 5 to 200, as well as the invoice date and tracking number.

107.    The alteration is also shown below with the altered quantity circled in red:

*Left:* **Original packing slip from Peerless.**          *Right:* **Version of packing slip that Liberty Air Parts submitted to DLA.**



108.    During oral testimony pursuant to 31 U.S.C. § 3733(h), George Onorato invoked the Fifth Amendment and declined to say whether he falsified the invoice to conceal the source and surplus condition of the Rivets:

Q.   Did you falsify an invoice from Peerless Aerospace to
     make it look like Peerless supplied rivets?

A.   I'm going to invoke the Fifth Amendment.

Q.   Did you falsify an invoice from Peerless Aerospace to
     conceal the fact that the items were surplus?

A.   I'm going to invoke the Fifth Amendment.

109.   He likewise declined to say whether he submitted false or altered documents to

DLA by invoking the Fifth Amendment:

Q.   Have you ever submitted any false documents to the
     Defense Logistics Agency?

A.   Based on my attorney's counsel, we're going to invoke
     the Fifth Amendment.

110.   Again invoking the Fifth Amendment, George Onorato declined to say whether he

or the Companies created false records to support their payment requests:

Q.   Did you create any false records to support claims for
     payment to the Defense Logistics Agency?

A.   I invoke the Fifth Amendment.

Q.   Are you aware of whether Liberty Air Parts or U.S.
     Supply Corporation created any false records to support
     claims to the Defense Logistics Agency?

A.   Fifth Amendment.

## COUNT I
## Violation of the False Claims Act: Presentation of False Claims
## (31 U.S.C. § 3729(a)(1))

111.    The United States incorporates by reference paragraphs 1 through 110 as though fully set forth herein.

112.    This is a claim against all defendants for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1), as amended, for knowingly presenting or causing to be presented false or fraudulent claims to the United States.

113.    Liberty Air Parts, US Supply Corporation, George Onorato, and Ellen Onorato presented, or caused to be presented, false or fraudulent claims to the United States for the Bolt, Rings, Knobs, and Rivets.

114.    Liberty Air Parts, US Supply Corporation, George Onorato, and Ellen Onorato did so knowingly. The False Claims Act defines "knowingly" as meaning that a defendant "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b). The definition requires "no proof of specific intent to defaud." *Id.*

115.    Liberty Air Parts, US Supply Corporation, George Onorato, and Ellen Onorato knew that the Bolt, Rings, Knobs, and Rivets were in surplus condition but supplied them to DLA anyway.

116.    They did so because the substitution gave them a competitive advantage.

117.    By substituting items in surplus condition without telling anyone, Liberty Air Parts, US Supply Corporation, George Onorato, and Ellen Onorato undercut the bidders who had properly disclosed their condition.

118.    The substitution also caused DLA to buy surplus items at higher prices.

119. These actions damaged the United States by causing DLA to overpay for surplus items and incur investigative and administrative costs. These actions further damaged the United States by undermining the integrity and fairness of the defense procurement system.

120. By reason of the false or fraudulent claims that Liberty Air Parts, US Supply Corporation, George Onorato, and Ellen Onorato presented or caused to be presented, the United States is entitled to three times the amount by which it was damaged, plus a civil penalty of not less than $10,781 and not more than $21,563 for each false claim presented or caused to be presented.

## CLAIM FOR RELIEF

WHEREFORE, the United States of America demands judgment against Liberty Air Parts, US Supply Corporation, George Onorato, and Ellen Onorato as follows:

a. Treble the damages sustained by the United States, as mandated by 31 U.S.C. § 3729(a)(1);

b. Civil penalties of between $10,781 and $21,563 for each false claim, as mandated by 31 U.S.C. § 3729(a)(1) and 81 Fed. Reg. 42491, *42494 (2016) (adjusting penalty amounts for inflation); and

c. Post-judgment interest, costs, and such other and further relief as the Court deems just and equitable.

Respectfully submitted,

WILLIAM M. McSWAIN
United States Attorney

GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

CHARLENE KELLER FULLMER
Assistant United States Attorney
Deputy Chief, Civil Division

MICHAEL S. MACKO
Assistant United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA  19106
Ph:     (215) 861-8415
Fax:    (215) 861-8618
Michael.Macko@usdoj.gov

*Attorneys for the United States of America*

Dated:  June 20, 2019

EXHIBIT 1

IN RE UNITED STATES DEPARTMENT OF JUSTICE
CIVIL INVESTIGATIVE DEMAND Nos. 2019-D-155 AND 2019-I-156

### **DECLARATION OF MICHELLE ARMSTRONG**

I, Michelle Armstrong, provide the following sworn declaration under penalty of perjury in response to Civil Investigative Demand Nos. 2019-D-155 and 2019-I-156 issued pursuant to the False Claims Act, 31 U.S.C. § 3733.

1.      Meggitt (North Hollywood), Inc. ("Meggitt"), a subsidiary of Meggitt-USA, Inc., is a supplier of high performance components and sub-systems to the aerospace industry. I serve as Meggitt's Senior Contracts Administrator Lead for the Flow Controls Product Group in the Meggitt Engine Systems Division.  In my capacity as Senior Contracts Administrator Lead, I have access to Meggitt's electronic records of sales to customers, including distributors and dealers who purchase parts from Meggitt.

2.      I am providing this declaration in lieu of more formal responses to the civil investigative demands, with the government's consent, because Meggitt does not possess responsive documents and a declaration is the most efficient way to convey the information responsive to the interrogatories.

3.      Meggitt is the original manufacturer of Bolts (PN 224638), one of the items defined in the civil investigative demands.

4.      As part of my regular job responsibilities, I am familiar with and have access to Meggitt's business records, including the records of transactions relating to Bolts.

5.      Meggitt maintains records relating to Bolts in one of two systems depending on when the transaction occurred.  Between October 1, 2013 and the present, Meggitt has used an SAP Enterprise Resource Planning ("ERP") system to maintain and manage its sales, invoicing,

and other transactions. Before transitioning to this SAP ERP system on October 1, 2013, Meggitt used a similar system called JDE ERP at least since January 1, 2003.

6.     I consulted the records from both systems to determine whether Meggitt supplied Bolts to US Supply Corporation or Liberty Air Parts.

7.     Meggitt has no record of selling Bolts to either US Supply Corporation or Liberty Air Parts between at least January 1, 2003 and the present.

8.     I am informed and believe, based on my review of the ERP data described above, that US Supply Corporation and Liberty Air Parts are not Meggitt's customers, and they were not Meggitt's customers at any time between at least January 1, 2003 and the present.

9.     US Supply Corporation and Liberty Air Parts are currently not authorized dealers or distributors of Meggitt products, including Bolts.

10.     I am informed and believe, based on my review of the ERP data described above, that US Supply Corporation and Liberty Air Parts were not authorized dealers or distributors of Meggitt products, including Bolts, at any time between at least January 1, 2003 and the present. If either of these companies had been an authorized dealer or distributor, then they would have appeared in either the SAP ERP or the JDE SAP with a sales history.

11.     The SAP ERP system shows that Meggitt has not sold Bolts to anyone between October 1, 2013 and the present.

12.     The earlier JDE ERP system shows that Meggitt sold Bolts to the following entities on February 27, 2007 and April 17, 2007, as shown below:

| OrderNo | OrderType | .PartNo | SoldToName | Description | Qty | UnitPrice | ExtPrice | OrderDate | ActShipDate | SerialNo | CustPO | SoldTo | InvoiceNo | InvoiceDt |
|---------|-----------|---------|------------|-------------|-----|-----------|----------|-----------|-------------|----------|--------|--------|-----------|-----------|
| 70452 | SO | 224638 | TRIUMPH ACCESSORY SERVICES | BOLT | 1 | $1,825.00 | $1,825.00 | 17-Apr-07 | 25-May-07 | 414417 | P034188 | 101030 | 795297 | 23-May-07 |
| 67854 | SO | 224638 | K.A.L. AVIATION INC. | BOLT | 2 | $1,324.00 | $2,648.00 | 27-Feb-07 | 18-May-07 | 414417 | 43666 | 207301 | 794862 | 18-May-07 |
| 67854 | SO | 224638 | K.A.L. AVIATION INC. | BOLT | 3 | $1,324.00 | $3,972.00 | 27-Feb-07 | 05-Mar-07 | 343827 | 43666 | 207301 | 790133 | 05-Mar-07 |
| 67854 | SO | 224638 | K.A.L. AVIATION INC. | BOLT | 5 | $1,324.00 | $6,620.00 | 27-Feb-07 | 18-May-07 | 414417 | 43666 | 207301 | 794862 | 18-May-07 |
| 67854 | SO | 224638 | K.A.L. AVIATION INC. | BOLT | 40 | $1,324.00 | $52,960.00 | 27-Feb-07 | 05-Mar-07 | 352383 | 43666 | 207301 | 790133 | 05-Mar-07 |

13.     I am unaware of Meggitt receiving or sending any communications to or from US Supply Corporation or Liberty Air Parts at any point in 2015 regarding an authorized dealer or distributor relationship.

14.     I am also unaware of Meggitt receiving or sending any communications from or to US Supply Corporation or Liberty Air Parts at any point in 2015 regarding Bolts.

15.     I am unaware of Meggitt possessing any communications or correspondence with either US Supply Corporation or Liberty Air Parts concerning any matter.

I hereby certify, based on information and belief, including my review of Meggitt's records as described herein, that all the documentary material and information required by Civil Investigative Demand Nos. 2019-D-155 and 2019-I-156 and in Meggitt's possession, custody, or control has been produced and made available to the false claims law investigator or custodian identified in the demands. I further certify that if any such material has not been produced because of a lawful objection, the objection and the reasons for it have been stated.

I declare under penalty of perjury under the laws of the United States of America (28 U.S.C. § 1746) that the forgoing is true and correct.

Dated: 3/27/2019

# EXHIBIT 2



**PEERLESS AEROSPACE FASTENER CORP.**
141 Executive Blvd., PO Box 710, Farmingdale, NY 11735-0710

Sales (631) 420-8200       Accounting (631) 962-2211
Expediting (631) 962-2214    Fax (631) 420-9617
Quality (631) 962-2217      Email: sales@pafcorp.com

## PACKING SLIP

| | |
|---|---|
| SALES NUMBER | SNYCMWJW |
| INVOICE NUMBER | INY2QWYF |
| INVOICE DATE | 02/09/16 |
| SHIP VIA | UPS |
| WAYBILL | 1Z1489847269703184 |
| CARTONS | 1 |
| WEIGHT (lbs.) | 1.00 |
| PAGE | 1 of 1 |

**SHIP TO:**
US SUPPLY CORP.
58 STRATFORD AVENUE
GREENLAWN, NY 11740

**SOLD TO:**
US SUPPLY CORP.
58 STRATFORD AVENUE
GREENLAWN, NY 11740

| CUSTOMER CODE | BUYER | | | | CUSTOMER PO NUMBER | | FOB | |
|---|---|---|---|---|---|---|---|---|
| G760 | GEORGE | | | | P975 | | FARMINGDALE | |
| SALES REP | | | | | EMAIL | | TERMS | |
| ERIC VISSICHELLI | | | | | EVISSICHELLI@PAFCORP.COM | | COD CO CHECK OK | |
| LINE # | ORDER QTY | SHIP QTY | BALANCE | UM | CUSTOMER PART / PAF PART | | PRICE ($) | TOTAL |
| 1 | 5 | 5 | 0 | EA | PLT1058-10-10 | | | |
| | | | | | VISU-LOK PLT'S | | | |
| | | 5 | | | MFG: ALCOA | | | |
| | | | | | LOT: 872650 | | | |
| | | | | | DESC: A/C RIVETS:7318.23.0000 | | | |
| | | | | | | | TOTAL | |

ALL PRICES IN USD

| Sealed and shipped by | |
|---|---|
| LUIS GUILLEN | Cage: 2G586 |

- Peerless BAE#: BAE/AG/20403/MMA
- Peerless AirbusUK#: 91011
- Applicable Terms and Conditions Document SER-FO-007 (attached and available at www.pafcorp.com) are incorporated as part of this document.
- Country of Origin U.S.A.

The quality system of this facility has been registered to the ISO 9001, AS9100 and AS9120 Standards.

The customer's use of a part number/description or our recital of a customer's designated part number/description does not of itself commit Peerless to supply parts of a specific manufacturer.

**CERTIFICATE OF CONFORMANCE**

It is hereby certified that all articles in the above shipment and in the quantities as called for in the above contractor's purchase order are in conformance with the requirements, specifications and drawings applicable to that order.



By: _Paul Feraca_

Paul Feraca
Quality Assurance Manager

SHI-FO-007 REV.A

# EXHIBIT 3



**PEERLESS AEROSPACE FASTENER CORP.**
141 Executive Blvd., PO Box 710, Farmingdale, NY 11735-0710

Sales (631) 420-8200          Accounting (631) 962-2211
Expediting (631) 962-2214     Fax (631) 420-9617
Quality (631) 962-2217        Email: sales@pafcorp.com

**PACKING SLIP**

| | |
|---|---|
| SALES ORDER | SNYCMWJW |
| INVOICE NUMBER | INY2QWYF |
| INVOICE DATE | 01/24/2016 |
| SHIP VIA | UPS |
| TRACKING | 1Z148984726970318 |
| NO. OF CARTONS | 1 |
| WEIGHT (LBS) | 1.00 |
| PAGE | 1 of 1 |

**SHIP TO:**
US SUPPLY CORP.
58 STRATFORD AVENUE
GREENLAWN, NY 11740

**SOLD TO:**
US SUPPLY CORP.
58 STRATFORD AVENUE
GREENLAWN, NY 11740

| CUSTOMER CODE | BUYER | | | | CUSTOMER PO NUMBER | | FOB | |
|---|---|---|---|---|---|---|---|---|
| G760 | GEORGE | | | | P975 | | FARMINGDALE | |
| SALES REP | | | | | EMAIL | | TERMS | |
| ERIC VISSICHELLI | | | | | EVISSICHELLI@PAFCORP.COM | | COD CO CHECK OK | |
| LINE | ORDERED | QTY SHIP | BALANCE | UM | CUSTOMER PART / PAF PART | | PRICE (USD) | TOTAL |
| 1 | 200 | 200 | 0 | EA | PLT1058-10-10 | | | |
| | | | | | VISU-LOK PLT'S | | | |
| | | | | | MFG: ALCOA | | | |
| | | | | | LOT: 872650 | | | |
| | | | | | DESC: A/C RIVETS:7318.23.0000 | | | |



RECEIVED
1·26·16

| | TOTAL | |
|---|---|---|

ALL PRICES IN USD

The quality system of this facility has been registered to
the ISO 9001, AS9100 and AS9120 Standards.

**Sealed and shipped by**

LUIS GUILLEN                    Cage: 2G586

- Peerless BAE#: BAE/AG/20403/MMA
- Peerless AirbusUK#: 91011
- Applicable Terms and Conditions Document SER-FO-007
  (attached and available at www.pafcorp.com) are
  incorporated as part of this document.
- Country of Origin U.S.A.

The customer's use of a part number/description or our recital of a customer's designated part
number/description does not of itself commit Peerless to supply parts of a specific manufacturer.
CERTIFICATE OF CONFORMANCE
It is hereby certified that all articles in the above shipment and in the quantities as called for in
the above contractor's purchase order are in conformance with the requirements,
specifications and drawings applicable to that order.

By: _____
Paul Feraca
Quality Assurance Manager

SHI-FO-007 REV A